**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTEL VAN DYKE, | |
| Plaintiff, | Case No. 21-CV-01448 |
| v. | Judge John Robert Blakey |
| COOK COUNTY SHERIFF'S OFFICE, *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Christel Van Dyke ("Plaintiff") sues the Cook County Sheriff's Office and several Cook County deputy sheriffs (collectively "Defendants") alleging that they violated her constitutional rights in connection with the Defendants' eviction and subsequent arrest of Plaintiff. [38]. Her Complaint asserts three claims against all Defendants pursuant to the Fourth and Fourteenth Amendments: False Arrest and Illegal Warrantless Search (Count I); Unlawful Detention (Count II); and Excessive Force (Count III). Now, Defendants jointly move to dismiss Counts I and II (unlawful detention) pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and all claims pursuant to Rule 12(b)(6) for failure to state a claim. [42]. For the reasons explained below, the Court grants Defendants' motion, [42].

## I.  Legal Standard

### A.  Federal Rule of Civil Procedure 12(b)(1)

When a movant raises subject matter jurisdiction as a ground for dismissal, the court shall consider that challenge first, as dismissal under Rule 12(b)(1) "makes all other challenges moot." *Althin CD Med., Inc. v. West Suburban Kidney Ctr., S.C.*, 874 F. Supp. 837, 839–40 (N.D. Ill. 1994); *see also* Fed. R. Civ. P. 12(b)(1). Facial challenges to subject matter jurisdiction only require a court to "look to the complaint and see if the plaintiff has sufficiently *alleged* a basis of subject matter jurisdiction." *Apex Digital, Inc. v. Sears Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Factual challenges, however, give federal courts the "ability to consider evidence beyond the pleadings." *Id.* at 444. Further, for factual challenges, if a defendant presents evidence that calls into question the Court's jurisdiction, then the "'presumption of correctness that we accord to a complaint's allegations falls away,'" and plaintiff bears the burden to present evidence that a court has subject-matter jurisdiction. *Id.* (quoting *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998)).

### B.  Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must state a claim to relief that is plausible on its face." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). To be facially plausible, the complaint must include enough factual allegations to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In evaluating the sufficiency of a complaint, a court accepts as true as true all well-pled factual allegations and draws all inferences in the plaintiff's favor. *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002). Although a complaint need not include "detailed factual allegations," mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" do not suffice. *Twombly*, 550 U.S. at 555.

## II. Background

On March 19, 2019, Cook County Sheriffs' Deputies Youpel, Redd, Bauer and Figueroa (hereinafter, "Deputy-Defendants") arrived at 18206 66th Avenue, Apartment 15 in Tinley Park, Illinois (the "Apartment") to evict Plaintiff. [38] ¶¶ 6, 13. They announced themselves as "Sheriff's Office" and asked Plaintiff to open the Apartment door. *Id.* ¶ 8. Plaintiff alleges that, after she opened the door, the Deputy-Defendants "barged" in and conducted a security sweep of the apartment "without identifying themselves…and without announcing their purpose." *Id.* ¶¶ 9–10.

Plaintiff also alleges that, after conducting the security sweep, Defendant Youpel told her they were there to execute a court-ordered eviction, but they did not show her any eviction paperwork. *Id.* ¶¶ 13–14. Plaintiff alleges that their "invasion" of the Apartment surprised her because her attorney had led her to believe that "no eviction was imminent." *Id.* ¶ 15. Plaintiff asked to collect her purse so she could call her attorney, but Defendant Youpel refused. *Id.* ¶¶ 16–18. Instead, Defendant Youpel demanded that Plaintiff leave the Apartment and, when she refused to leave without her purse and phone, the Deputy-Defendants "summarily muscled her out

3

the front door," placed her in handcuffs, and told her that she was going to jail. *Id.* ¶¶ 18–20. Plaintiff further alleges that the Deputy-Defendants used "physical brutality" to remove and handcuff her, which caused her pain and worsened existing neck and back injuries. *Id.* ¶ 22. Plaintiff claims that she now has "new and exacerbated injuries" that she noticed after the incident concluded. *Id.* ¶ 23.

After Plaintiff was in handcuffs and outside the Apartment, Defendant Sergeant Mitchell arrived on the scene but she "did nothing to temper Youpel's impulsive vindictiveness or prompt a de-escalation or rational consideration of whether Plaintiff should be taken into custody." *Id.* ¶ 33. Instead, Defendant Mitchell advised Plaintiff that she "was in custody." *Id.* ¶ 34.

After the Deputy-Defendants took Plaintiff to jail, without her belongings, a judge found probable cause to detain Plaintiff for "resisting or obstructing a peace officer" in violation of Illinois law. *Id.* ¶¶ 25–26. Plaintiff remained in jail for two days before she posted bond. *Id.* ¶ 26. On August 18, 2021, prosecutors formally dropped the charges with an order of Nolle Prosequi. *Id.* ¶ 27.

Plaintiff now sues the Deputy-Defendants and Defendant Sergeant Mitchell, pursuant to 18 U.S.C. § 1983, alleging that they violated her constitutional rights by: (1) conducting an unauthorized sweep of her apartment and arresting her without probable cause (Count I); (2) unlawfully detaining her (Count II); and (3) using excessive force to remove her from the apartment and handcuff her (Count III). [38]. She also asserts her claims against the Cook County Sheriff's Office, alleging that the individual Defendants acted "pursuant to and in accordance with" the Sheriff's

4

Office's "policies and practices." *Id.* ¶ 37. Plaintiff also attaches body-worn camera ("BWC") footage to her Complaint that, according to her, depict the Defendants' allegedly unconstitutional conduct. *Id.* ¶¶ 6–7, 28, 36, 43, 48, 52.

## III. Discussion

As an initial matter, Plaintiff asserts her claims of unlawful search and arrest (Count I), unlawful detention (Count II), and excessive force (Count III) pursuant to the Fourth Amendment and Fourteenth Amendment. [38]. Defendants argue, however, that the Fourth Amendment provides the exclusive basis for Plaintiff's claims. [42-1] at 19. In response, Plaintiff concedes as much as to her unlawful search and arrest claim (Count I) by failing to address it, but she insists that the Fourteenth Amendment still applies to "Defendant's conduct after taking Plaintiff into custody," which implicates both her unlawful detention and her excessive force claims, since her two days in jail "was itself an instance of unreasonable, excessive, and unnecessary force." [45] at 7-8.

Given the law and the allegations in the Complaint, Defendants' view prevails here. Namely, the Supreme Court held in *Manuel v. City of Joliet* that "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of the legal process." 580 U.S. 357 (2017). Likewise, the Supreme Court held in *Graham v. Connor* that "claims that law enforcement officers have used excessive force" whether "in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. 386, 395

(1989). Further, while the Fourteenth Amendment's due process requirements may govern an excessive force claim brought by a pretrial detainee, *see Kingsley v. Hendrickson*, 576 U.S. 389, 401 (2015), Plaintiff does not allege any instances of excessive force used against her during her pretrial detention, [38]. Instead, she alleges that Defendants "used excessive force in removing Plaintiff from the Apartment and arresting Plaintiff." *Id*. ¶ 53. *Graham* makes clear that the Fourth Amendment exclusively governs such a claim. Accordingly, the Court will proceed to analyze Plaintiff's claims as Fourth Amendment claims.

## A. Standing to Assert a Fourth Amendment Unlawful Search Claim

Defendants first argue Plaintiff does not have standing to allege an illegal search claim based upon the Deputy-Defendants' protective sweep of the Apartment because a court issued a valid order of eviction well before March 19, 2019. [42-2] at 5–7. According to Defendants, Plaintiff lost any right to claim Fourth Amendment right of privacy in the Apartment following issuance of this eviction order terminating her possessive rights to the property. *Id.* In support, they attach the court's final eviction order along with court documents showing Plaintiff's unsuccessful attempts to obtain a stay and a letter that the Sheriff's Office sent to Plaintiff's residence notifying her of the court's final eviction order. [42-4]; [42-11]; [42-12].

The Fourth Amendment protects a person's right "to be secure in their persons, papers, and effects, against unreasonable searches and seizures." *Payton v. New York*, 445 U.S. 573, 589–90 (1980). Absent exigent circumstances, warrantless entry into a person's home is patently unreasonable. *Id.* The Fourth Amendment privacy

protection only applies, however, to premises where a plaintiff "enjoys a subjective expectation of privacy" that society also recognizes "as reasonable." *Kyloo v. United States*, 530 U.S. 27, 33 (2001).

Further, standing remains "an essential component of Article III's case-or-controversy requirement." *Apex*, 572 F.3d at 443. Absent a cognizable interest in the property searched, a plaintiff typically cannot establish standing to bring a Fourth Amendment claim. *See In re FedPak Sys., Inc.*, 80 F.3d 207, 213 (7th Cir. 1996) (finding that plaintiff lacked standing to seek a clarification order from the court because it "no longer owns any intellectual property rights" in the subject property); *Duggan v. Terzakis*, 275 F. Supp. 2d 968, 972 (N.D. Ill. 2003) (finding that plaintiffs who did not have a property interest did not have standing to bring state law claims); *United States v. 8402 W. 132nd St., Palos Park, Ill.*, 103 F. Supp. 2d 1040, 1042 (N.D. Ill. 2000) ("A court's consideration of a claimant's interest in property is merely a proxy for examining injury in fact.").

In arguing that Plaintiff does not have standing to assert an unlawful search claim, Defendants rely on *United States v. Curlin*, 638 F.3d 562 (7th Cir. 2011). There, a state court had ordered the defendant to vacate his leased residence and law enforcement left copies of the eviction order at his door. *Id.* at 563–64. Two weeks later, officers went to the residence to enforce the eviction. *Id.* They entered the defendant's residence and conducted a security sweep, during which they found and confiscated illegal drugs and firearms. *Id.* After being charged for possession of firearms by a convicted felon, the defendant moved to suppress the evidence, arguing

that the officers unlawfully searched his home without a warrant in violation of his Fourth Amendment rights. *Id.* The district court denied the defendant's motion to suppress, and the Seventh Circuit affirmed, holding that, because the defendant "had been evicted over two weeks earlier," he had "no legitimate expectation of privacy in the residence" and thus "no Fourth Amendment search occurred." *Id.* at 565.

Defendants argue that, under *Curlin,* Plaintiff has no standing to assert a Fourth Amendment violation for the Deputy-Defendant's security sweep of the Apartment. The Court agrees. Here, as in *Curlin,* a state court had issued a lawful and final order of eviction for Plaintiff's residence. Defendants also submitted evidence—in the form of a letter sent to Plaintiff's residence—that shows Plaintiff had notice of the final order. Further, Defendants also present evidence that shows that Plaintiff unsuccessfully attempted to stay the eviction, further evincing that she knew of the final order for eviction.

Given Defendants' factual challenge to standing, Plaintiff bore the burden to present evidence that she did, in fact, retain a reasonable expectation of privacy in the Apartment. She fails to do so. Instead, she concedes that she knew about the eviction order as of March 19, 2019, [38] ¶¶ 6, 15, but argues that her complaint sufficiently alleges that she *believed* that she still had a constitutionally protected right of privacy in the Apartment. Plaintiff complains that Defendants' standing argument "raises an issue of fact by impermissibly contradicting facts alleged in the Complaint," [45] at 6. According to her, Defendants may not justify "the invasion of" the Apartment by "claiming clairvoyantly to know that Plaintiff, a non-lawyer, 'knew'

she had no interest in the apartment and therefore no expectation of privacy on the eviction date." *Id*. at 5–6.

Plaintiff's arguments fail. Even if she subjectively believed she had a privacy interest, she must also establish that her subjective belief was objectively "reasonable." *Kyloo*, 530 U.S. at 33. She offers no evidence, or even argument, to establish this. Plaintiff may have misunderstood the legal implications of the eviction order, but she does not establish how her misunderstanding gave her a reasonable expectation of privacy. *See Curlin*, 638 F.3d at 565–66 (noting defendant had no legitimate expectation of privacy to residence when he had notice through an eviction order that continued presence was unlawful). Overall, Plaintiff has failed to come "forward with competent proof that standing exists" for her illegal search claim. *Apex*, 572 F.3d at 444. Therefore, the Court dismisses her Count I unlawful search claim for lack of standing.

### B. *Rooker-Feldman* Doctrine as to False Arrest (Count I) and Unlawful Detention (Count II) Claims

Defendants also seek dismissal of Plaintiff's false arrest (Count I) and unlawful detention (Count II) claims pursuant to Rule 12(b)(1). [42-2] at 3–4. Namely, Defendants argue that the *Rooker-Feldman* doctrine precludes Plaintiff from claiming that Defendants falsely arrested and detained her without probable cause because a state court found that there existed probable cause to arrest her. *Id.*

The *Rooker-Feldman* doctrine derives from two Supreme Court decisions, which held that lower federal courts cannot review state court final decisions. *Rooker v. Fid. Trust Co.*, 263 U.S. 413, 416 (1923); *D.C. Court of Appeals v. Feldman*, 460

U.S. 462, 482 (1983); *see also Holt v. Lake Cnty. Bd. of Comm'rs*, 408 F.3d 335, 336 (7th Cir. 2005) (discussing origin of the *Rooker-Feldman* doctrine). Rather, only the Supreme Court "has appellate jurisdiction to reverse or modify a state court judgment." *Holt*, 408 F.3d at 336. The Supreme Court later clarified the doctrine and explained that it applies when a party loses in state court and then, complaining of injury, asks a lower federal court to review and reject the state court judgment. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283–85 (2005). When *Rooker-Feldman* is raised, it implicates the federal court's jurisdiction, not just the legal sufficiency of a claim. *See Holt*, 408 F.3d at 336.

To determine whether *Rooker-Feldman* applies, the Seventh Circuit instructs that a court must examine "whether the federal plaintiff seeks to set aside a state court judgment or whether he is, in fact, presenting an independent claim." *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017) (quoting *Taylor v. Fed. Nat'l Mortg. Ass'n*, 374 F.3d 529, 532 (7th Cir. 2004)). Here, Defendants argue that Plaintiff's unlawful arrest and detention claims directly implicate the state court's probable cause finding because the claims ask this Court to invalidate a state court probable cause "judgment." [42-1] at 3–4. They also insist that, although Plaintiff does not explicitly ask this Court to invalidate the state court's finding, her claims remain "inextricably intertwined" with the state court's finding and thus implicate *Rooker-Feldman*. [46] at 2–4.

In support of their latter argument, Defendants rely on *Swartz v. Heartland Equine Rescue*, 940 F.3d 387 (7th Cir. 2019). There, the state seized horses that the

10

plaintiffs owned after a court made an *ex parte* probable cause finding based upon a government veterinarian report of animal cruelty. *Id.* at 389. The state also filed criminal charges against the plaintiffs for animal cruelty after which the state court ratified its earlier finding of probable cause. *Id.* Eventually, the state entered into a pretrial diversion agreement with the plaintiffs who then sued the officers for unlawful arrest and illegal seizure of their horses. *Id.* The district court dismissed plaintiffs' claims and the Seventh Circuit affirmed as to the illegal seizure claim, finding that the state court's probable cause finding implicated Rooker-Feldman because to "find the defendants acted wrongfully in seizing the animals would call into question the state court's judgment that there was probable cause the animals were being neglected under Indiana law." *Id.* at 390. Therefore, it held that *Rooker-Feldman* doctrine divested the district court of subject matter jurisdiction of the plaintiffs' unlawful seizure claims.

Defendants insist that the unlawful seizure claim in *Swartz* and Plaintiff's unlawful seizure and detention claims here remain analogous. Not so. In *Swartz*, the plaintiffs complained of a seizure of property made *pursuant* to a state court's probable cause finding. *Swartz*, 940 F.3d at 390. Here, in contrast, the Defendants' arrest of Plaintiff came first, and the state court's probable cause finding followed.

The Seventh Circuit's decision in *Jensen v. Foley*, 295 F.3d 745 (7th Cir. 2002) proves instructive on this crucial distinction. In *Jensen*, the court examined whether the *Rooker-Feldman* doctrine barred § 1983 claims for Fourth and Fourteenth Amendment violations in connection with the warrantless removal of a child from a

11

home where, after removal, a court found probable cause existed for the removal. 295 F.3d at 746–47. The court found *Rooker-Feldman* did not apply to the child's initial removal because the § 1983 claims did not seek "to remedy an injury *inflicted* by the state court's decision." *Id.* at 747 (citing *Durgins v. City of East St. Louis*, 272 F.3d 841 (7th Cir. 2001)); *see also Bishop v. Marion Cnty. Sheriff*, 13-cv-2057, 2015 WL 5613334, at *6 n.12 (S.D. Ind. Sept. 23, 2015) (finding *Rooker-Feldman* did not bar a claim Fourth Amendment claim for unlawful removal of minors where the state removed the minors before the state court found there existed probable cause for removal).

So too here. Defendants did not detain and arrest Plaintiff pursuant to any court order but rather acted of their own volition through a warrantless arrest. *See* [38] ¶ 26. The probable cause finding came after-the-fact. *Id.* Accordingly, the Court finds that the *Rooker-Feldman* doctrine does not bar Plaintiff's false arrest or unlawful detention claim.[1]

## C.    Rule 12(b)(6) Arguments

The Court now turns to Defendants' arguments for dismissal pursuant to Rule 12(b)(6) for failure to state a claim. [42-1] at 12–20. In short, Defendants argue that: (1) the Complaint and BWC footage that Plaintiff attached to it establish that the arresting officers lawfully arrested Plaintiff using appropriate force; (2) Plaintiff

---

[1] Plaintiff also alleges unlawful detention based upon the two days she remained in custody after the state court judge's probable cause finding. [38] ¶ 26. This may raise different issues for Plaintiff since a court's probable cause finding enjoys a "presumption of validity" unless Plaintiff alleges that the court based its determination on falsified evidence or statements. *Lewis v. City of Chi.*, 914 F.3d 472, 477 (7th Cir. 2019). The Complaint makes no such allegations about the court's probable cause finding, but Defendants also do not raise such issues in their motion. Thus, the Court does not address it.

cannot show that Defendant Sergeant Mitchell, who arrived after the arrest, had any personal involvement in the alleged constitutional violations; and (3) Plaintiff improperly seeks to hold Defendant Cook County Sheriff's Office vicariously liable for its employees alleged conduct. *Id.*

      **1.**    **Unlawful Arrest, Unlawful Detention and Excessive Force Claims Against Deputy-Defendants Youpel, Redd and Figueoro**

In moving to dismiss, the Deputy-Defendants rely principally upon the BWC footage that Plaintiff attached to her Complaint, arguing that it establishes that there existed probable cause to arrest her for "refusing to comply with their lawful orders, and for physically resisting her eviction." [42-1] at 15.

At this preliminary stage, a court must accept allegations as true and "construe all inferences in the plaintiff's favor." *Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). In doing so, a court may also "consider any facts set forth in the complaint that undermine the plaintiff's claim." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). This includes "exhibits attached to the complaint" and "documents referenced in the pleading if they are central to the claim." *Id.* Further, if "an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Id.* (citing *Forrest*, 507 F.3d at 542).

In some cases, courts face the challenging task of determining if a video or document—referenced in a complaint but not attached to it—qualifies as "central to the claim." *See, e.g., Brown v. City of Chi.*, 21-cv-1397, 2022 WL 865796, at *3–5 (N.D. Ill. Mar. 23, 2022) (declining to consider body camera footage that plaintiff did not

attach to his complaint and that does not show the entire incident); *Hyung Seok Koh v. Graf*, No. 11-cv-2605, 2013 WL 5348326, at *9 (N.D. Ill. Sept. 24, 2013) (considering footage of a police interrogation on a motion to dismiss where the footage captured most of the questioning and the interrogation was central to the plaintiff's claims).

Here, however, Plaintiff not only repeatedly references the BWC footage in her Complaint, but she included it as an exhibit to her Complaint. [38] ¶¶ 6, 18, 28, 36, 52. Further, she does not argue that the Court should not consider it on a motion to dismiss or that it does not tell the complete picture of what occurred when officers arrested her. Instead, she argues that the "video is entirely consistent with the allegations of the Complaint in that it irrefutably shows that Plaintiff was subjected to *unreasonable* force" and that the Defendant officers "assaulted an elderly woman to prevent her from changing out of her pajamas, getting her shoes and coat, gathering her cell phone, purse, and medications, and making a phone call to her lawyer." [45] at 6–7 (emphasis in original). Given this record, the Court may properly consider the BWC footage on a motion to dismiss to decide whether Plaintiff alleges plausible claims.

### a) BWC Footage

The Court begins by summarizing the BWC footage. It begins with Deputy-Defendants arriving at Plaintiff's building where a third-party let them into the breezeway and directed them to the Apartment door. They knocked and announced, "sheriff's office, hello." A dog barked but nobody answered, so a Deputy stated, "open the door, or we will force entry." Plaintiff opened the door with a small dog in her

arms; the Deputies entered; and Plaintiff immediately stated, "I'm calling my attorney" and tried to leave to get her phone. Defendant Youpel instructed her to talk to them first. Plaintiff refused, yelling that she wanted her phone to call the Sheriff's Office. Defendant Youpel told Plaintiff that they were the Sheriff's Office and asked her to step aside to talk. Plaintiff refused and walked away, yelling "okay, that's it."

Defendant Youpel again asked Plaintiff to stop so that they could speak and, papers in hand, explained to Plaintiff that they were there for a court ordered eviction. Plaintiff interrupted, telling Youpel that "This is not normal" and yelling that she "got no notification" of an eviction today. Next, Defendant Youpel ordered Plaintiff several times to step out of the Apartment, but she refused and insisted that she wanted her phone to speak with her attorney, that she was sick, and that she had a right to make a phone call. Deputy Youpel told Plaintiff that she could make her phone call outside the Apartment, but she would "go to jail" if she continued to refuse to leave the Apartment. *Id.* Plaintiff did not comply and instead continued to insist on calling her lawyer, telling Deputy Youpel that she "will not leave here" and had "No notification." Deputy Youpel tried to lead Plaintiff out of the Apartment; but Plaintiff yelled, "I get my purse, God dammit, that's it" and grabbed onto the edge of the wall near the front door. Still inside the Apartment, Defendant Youpel next attempted to place Plaintiff in handcuffs but Plaintiff began repeatedly screaming "Stop it", "Help" and "You can't force me out of here." Defendants Youpel, Redd and Figueroa then had to force Plaintiff out of the Apartment as Defendant Bauer took

the dog from her.  Plaintiff hooked her foot on the edge of the wall near the door as the Deputies tried to get her out of the apartment, but they eventually got her out. Once out, Defendants Youpel, Redd and Figueroa turned Plaintiff toward the hallway wall and handcuffed her hands behind her back; Plaintiff began to yell "Ow," "My neck hurts," and "I have a broken neck."  Defendant Youpel told her to calm down and that they would call for an ambulance, but Plaintiff continued to cry and yell, "My neck," "Ow" and "Get his hands off of me."

After Defendants Youpel, Redd and Figueroa handcuffed Plaintiff's hands behind her back, they sat her down on the breezeway stairs.  While sitting on the steps, Plaintiff began yelling "You're going to jail bitch," "I got no notification," and "I have a severe problem with my neck you idiots."  Next, Defendant Youpel instructed Plaintiff to stand up so that they could fix her handcuffs, but Plaintiff insisted she could not stand on her own and yelled at Defendant Youpel to help her.  When Defendant Youpel told her to stop yelling and tried to help her up, Plaintiff continued to yell, "Ow" and "That's not helping," telling Youpel that she needed help from both sides.  So, Defendants Reed and Youpel both helped up Plaintiff.  They walked Plaintiff to the wall, removed the handcuffs and then replaced them with Plaintiff's hands in front of her body while Plaintiff yelled "I am a disabled person, and you are in some very serious problems."  Plaintiff again complained that the handcuffs were too tight so Deputy Reed showed Plaintiff that his finger could fit between the cuffs and Plaintiff's wrists.  She still insisted, however, that they remained too tight.

16

After retaking a seat on the steps, Plaintiff again demanded items from the Apartment before going to jail, but the Deputy-Defendants did not let her retrieve items from the Apartment. One of them radioed for the ambulance's status but Plaintiff said, "I don't need an ambulance" and that she wanted to see her doctor and attorney. Shortly after, Sergeant Mitchell arrived and spoke with Deputy Youpel outside. Paramedics also arrived and Plaintiff told them that she had chronic neck issues and that the Deputy-Defendants put her in handcuffs behind her back for no reason. *Id.* When the paramedics asked about pain other than her wrists, she stated, "I'm fine, I will talk to my doctor about all this" and that she was "sore" but did not need hospital attention. *Id.* Plaintiff refused to let the paramedics check her vitals and declined to go to a hospital. *Id.* The Deputies then transported Plaintiff and booked her into jail. *Id.*

### a) Fourth Amendment False Arrest (Count I) and Unlawful Detention (Count II)

To establish a false arrest claim, "a plaintiff must show that there was no probable cause for her arrest." *Neita v. City of Chi.*, 830 F.3d 494, 497 (7th Cir. 2016). Probable cause exists if the "facts and circumstances within the officer's knowledge" at the time of the arrest "are sufficient to warrant a prudent person, or one of reasonable caution, in believing in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Mich. v. DeFillippo*, 443 U.S. 31, 37 (1979); *see also Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (same). Here, Defendants argue that Plaintiff's false arrest and unlawful detention claims fail as a matter of law because the BWC footage shows that they had probable

cause to arrest her for resisting/obstructing a peace officer in violation of Illinois law. [42-1] at 15 (citing 720 ILCS 5/31-1(a)).  The Court agrees.

Under Illinois law, "a person commits obstruction or resistance of a peace officer when, (1) knowing that one is a peace officer, (2) he or she knowingly resists or obstructs (3) the officer's performance of an authorized act." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 721 (7th Cir. 2013) (citing 720 ILCS 5/31-1(a)).  Here, Plaintiff's Complaint and the BWC footage establish elements (1) and (3).  Namely, as to element (1), the Complaint acknowledges that the Deputies announced their office yelling "Sheriff's Office" before she opened the door. [38] ¶ 8.  The BWC footage also shows that the Deputies wore uniforms with "Sheriff" written on the back and they confirmed inside the Apartment that they were, in fact, from the Sheriff's Office.

As to element (3), the Complaint acknowledges that the Deputies told Plaintiff that they were there for a court-ordered eviction.  [38] ¶ 13.  Further, even though Plaintiff complains that the Defendants did not give her a copy of the eviction order, *id.* ¶14, she does not allege or argue that they did not, in fact, have authorization to evict her.

That leaves element (2)—whether Plaintiff knowingly resisted or obstructed the Defendants' efforts to execute the eviction order.  In the past, courts required evidence of some "physical act" of resistance or obstruction, *Williams v. Jaglowski*, 269 F.3d 778 (7th Cir. 2001), but the Illinois Supreme Court has clarified that a physical act "is neither an essential element of nor the exclusive means of committing an obstruction," *People v. Baskerville*, 963 N.E.2d 898, 903 (Ill. 2012); *see also*

*Martinez v. City of Chi.*, 900 F.3d 838, 848 (7th Cir. 2018) (discussing *Baskerville* and holding that obstruction under Illinois law "does not turn on the performance of a physical act"). Further, Illinois law holds that disobeying an officer's commands may qualify as an obstruction under Illinois law. *See People v. Smith*, 77 N.E.3d 87, 92 (Ill. App. Ct. 2013)

Here, Plaintiff's Complaint and the BWC footage establishes element (2). First, Plaintiff's own Complaint admits that she disobeyed lawful commands, because she concedes that she repeatedly refused to leave the Apartment despite Defendant Youpel's requests. [38] ¶¶ 17–24. The BWC footage also confirms this refusal, showing that she yelled she would not leave, even after Deputy Youpel told Plaintiff that she would be arrested if she did not comply. Second, although Illinois does not require a "physical act" for obstruction, the BWC footage also shows that Plaintiff engaged in more than just verbal argument—she held on to the doorway with her hand and then with her foot to actively and physically resist leaving the Apartment (and resisted releasing the dog in her arms).

In alleging unlawful arrest, the Complaint alleges that the "existence of an eviction does not justify the seizure of an occupant's person", [38] ¶ 40, and that Defendants illegally seized Plaintiff because they did so "without ever showing her a copy of a court order authorizing the officers' presence", *id*. ¶ 45. These allegations fail to create a cognizable false arrest claim. First, even where the eviction order in-of-itself does not justify seizing an occupant, Plaintiff does not explain how her admitted misconduct fails to constitute obstruction of the Defendants' authorized act

of evicting her pursuant to that lawful court order. Second, Plaintiff does not point
to any legal authority that required the Defendants to show her a copy of the court
order authorizing the eviction before they could execute that order. Even if they did
not show her the order, she admits that they told her that they were executing a
court-ordered eviction. Therefore, she knew their purpose for being there, and the
record otherwise confirms she remained aware of the eviction order and fails to allege,
even now, that the Deputy-Defendants did not, in fact, possess a valid court order to
evict her.

Overall, the Complaint and the BWC footage—even viewed in the light most
favorable to Plaintiff—affirmatively establish that the Deputy-Defendants possessed
probable cause to arrest Plaintiff for obstructing their efforts to execute the eviction
order. Accordingly, Plaintiff fails to allege a plausible Fourth Amendment false
arrest claim (Count I). And because she cannot allege a false arrest claim, her claim
for unlawful detention (Count II) based on that arrest also fails.

## 2. Excessive Force Claim (Count III)

The law assumes that "the right to make an arrest or investigatory stop
necessarily carries with it the right to use some degree of physical coercion or threat
thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 395 (1989). But that does not
mean that officers may use any force; it must still be reasonable. *Id*. Thus, to show
excessive force in violation of the Fourth Amendment, a plaintiff must establish that
officers acted objectively unreasonably given the facts and circumstances of the
situation that they faced. *Id*.

Here, Plaintiff's Complaint alleges in conclusory fashion that the Defendants used "excessive and unreasonable force" on her, "brutalized" her "to force her to leave the apartment," and "exacerbated her existing injuries while inflicting new ones." [38] ¶¶ 28–29, 39. But the Complaint does not describe what the Deputy-Defendants did except that they allegedly went "hands-on" with her, "muscled" her "out of the door" and placed her in handcuffs. *Id*. ¶¶ 18, 28. Instead, the Complaint points to the BWC footage, alleging that it "shows in irrefutable and graphic detail how Defendants abused, degraded, and brutalized Plaintiff." [45] at 1–2; *see also* [38] ¶¶ 28, 36, 52.

In moving to dismiss, Defendants argue that the BWC footage shows just the opposite—that they used appropriate force under the circumstances. [42-1] at 12–16. The Court agrees. Even viewing the footage in the light most favorable to Plaintiff, it fails to show any unlawful conduct by Defendants Youpel, Reed or Figueroa[2] or that they ever acted unreasonably in how they seized and handcuffed Plaintiff when she refused multiple orders to leave the Apartment. Further, the BWC footage shows that when Plaintiff told Defendants Youpel, Reed and Figueroa that she had a pre-existing neck injury, they immediately radioed for an ambulance; and then, when Plaintiff complained that it hurt her neck to be handcuffed with her arms behind her back, Defendant Youpel and Reed stood her up (at her request) and re-handcuffed her with her hands in front of her. And, when Plaintiff complained that the handcuffs

---

[2] The BWC footage also shows that Deputy-Defendant Bauer, although present, only removed the dog from Plaintiff's arms and otherwise did not touch Plaintiff.

were too tight, Defendant Reed showed her that he could fit his finger between the cuffs and Plaintiff's wrist. None of this plausibly suggests excessive force.[3]

Even viewing the BWC footage in the light most favorable to Plaintiff, it does not suggest excessive force. Accordingly, the Complaint—which relies on the BWC Footage to allege excessive force—does not allege a plausible excessive force claim against the Deputy-Defendant.

## B. Claims Against the Sheriff's Office and Sergeant Mitchell

Finally, Plaintiff also sues Sergeant Tara Mitchell and the Cook County Sheriff's Office for alleged Fourth Amendment violations. [38]. The Complaint acknowledges that Sergeant Mitchell did not arrive to the Apartment until after the Deputy-Defendants handcuffed her but alleges that Sergeant Mitchell "did nothing to temper Youpel's impulsive vindictiveness or prompt a de-escalation or rational consideration of whether Plaintiff should be taken into custody." *Id.* ¶¶ 33–34. As to Defendant Cook County Sheriff's Office, the Complaint alleges that the other Defendants acted "pursuant to and in accordance with" the Sheriff Office's "policies and practices." *Id.* ¶ 37. Defendants Mitchell and Cook County Sherriff's Office argue that these allegations do not suffice to hold them liable under § 1983. [42] at 12–14.

---

[3] The BWC footage submitted by Plaintiff came from Defendant Bauer's camera, and even though he did not physically assist in removing Plaintiff from the Apartment or handcuffing her, Defendant Bauer stood only a few feet away from the other Defendants and his camera captured the events. In the footage, there are a few seconds when he walked away to attend to Plaintiff's dog (and then later steps away to help look for Plaintiff's shoes and purse), but Plaintiff does not allege that the other Defendants did anything in those seconds to support an excessive force claim. To the contrary, her response to Defendants' motion makes clear that she believes the BWC footage "speaks for itself and shows unreasonable force—in spades" and that watching it "one knows instinctively that it depicts unreasonable and unacceptable police conduct." [45] at 6–7. Not so.

As to Sergeant Mitchell, Plaintiff appears to allege a failure to intervene theory. [38] ¶ 33. Yet, the Court has found that Plaintiff's claims all fail as to the other Defendants. Without an underlying constitutional violation, there cannot exit any failure to intervene. *See Yang v. Hardin*, 37 F.3d 282 (7th Cir.1994) (holding a failure-to-intervene theory holds an officer liable for failing "to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens").

The same goes for the Cook County Sheriff's Office. That is, even if Plaintiff's conclusory assertion that the individual defendants acted pursuant to "policies and practices" sufficed to state a policy-and-practice *Monell* claim—and it does not, *see McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011)—a *Monell* claim fails as a matter of law if there exists no underlying constitutional violation, *see Monell v. Dept. of Social Srvcs. of City of New York*, 436 U.S. 658, 694 (1978) (holding that a policy-and-practice claims relate to alleged policies "as the moving fore of the constitutional violation").[4]

---

[4] The individual Defendants also argue that, in the alternative, they are entitled to qualified immunity from Plaintiff's claims. [42-1] at 20. The Court does not consider this alternative argument, however, given the Court's findings based on Defendants' other arguments.

## II.     Conclusion

For the reasons stated above, the Court grants Defendants' motion to dismiss [42] in its entirety.  It dismisses without prejudice her illegal search claim (Count I) for lack of standing and her excessive force claim (Count III) for failure to state a claim.  It also dismisses with prejudice her illegal seizure (Count I) and unlawful detention (Count II) claims because her Complaint (and the video footage she attaches to it) establish that there existed probable cause for her arrest.


Dated:  September 27, 2022          Entered:

John Robert Blakey
United States District Judge

24